**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**TEXARKANA DIVISION**

ROSIE L. DAVIS, *et al.*

                                                                    PLAINTIFFS

v.                                          No. 4:88-cv-4082

WILLIAM DALE FRANKS, *et al.*                               DEFENDANTS

BRIEF IN SUPPORT OF MOTION TO INTERVENE AND
DECLARE HOPE SCHOOL DISTRICT UNITARY

Federal court supervision of schools must be time-limited: both the Supreme Court and Eighth Circuit have made clear that courts should return authority to the States and districts as soon as possible. That's true even if districts would *prefer* to remain under judicial management. Districts may want to use consent decrees as a shield against state education policies they disfavor. But unless the State is actively violating the Constitution, it gets to set the rules; federal courts do not.

Here, the Hope School District has declined to seek termination of a dormant, decades-old consent decree for more than a year after the Eighth Circuit suggested it should. Rather, it entered *another* consent decree, purportedly extending judicial supervision for at least another three years. But continued supervision is unnecessary—by Hope's own account, it ceased discriminating decades ago—and only ties State policymakers' hands further. Because Hope has not yet sought termination, the Arkansas Department of Education and State Board of Education now move to intervene and ask this Court to declare Hope fully unitary.

## I.      Background

Thirty-five years ago, a set of black students and teachers charged the Hope School District with race discrimination. Doc. 1. Hope, they said, gave black faculty members less-desirable

positions. *Id.* ¶¶ 8-12. And it functionally segregated students by disproportionately sorting black students into vocational-track classes while putting white, middle-class students in college-track programs. *Id.* ¶ 13.

That lawsuit terminated in a consent decree aimed at ending racial discrimination in "any of [Hope's] operations including . . . faculty assignments [and] student assignments." Doc. 38 ¶ 3. Among other things, Hope agreed to implement fair promotion criteria, prioritize hiring black staff, and end the vocational- or college-track sorting. *Id.* ¶¶ 5-6, 13.

Aside from an unrelated motion to approve school-board redistricting, the Hope case lay dormant for nearly two decades. Then five years ago, Hope invoked the consent decree in an attempt to get out of Arkansas's interdistrict school-choice program. Doc. 100. Hope asserted that allowing school choice would produce *de facto* resegregation. *Id.* at 21. But it did not claim any current problems with race discrimination. To the contrary, Hope's superintendent testified at a preliminary-injunction hearing that Hope was "unitary in every fashion that [it] can become unitary in with the exception of School Choice." Doc. 169 at 113. And he confirmed that Hope has no intention of discriminating against black employees or black students. *Id.* at 123-24, 133-34.

The Eighth Circuit rejected Hope's school-choice argument. *United States v. Junction City Sch. Dist.*, 14 F.4th 658, 666 (8th Cir. 2021) (explaining that Hope's consent decree had "nothing to do with interdistrict school transfers"). And in doing so, it raised red flags about Hope's consent decree "continuing in place." *Id.* at 668. Because no party had invoked the consent decree for decades, it was "unclear" to that court whether "there [was] any reason for the continued federal oversight." *Id.* Conversely, it acknowledged that leaving the decree in place would needlessly frustrate valid state policies. *Id.* at 667-68.

To free Arkansas policymakers from this "overbroad" and "outdated" consent decree, the Eighth Circuit suggested that this Court should move forward and "hold a unitary status hearing and consider removing the[] case[] from the federal docket." *Id.*  But Hope apparently has no interest in ever concluding this case.  Rather, it recently leveraged the existing consent decree to get grant funding and, in the process, entered yet another consent decree.  Doc. 205-1.  Among other things, this second decree provides a windfall to plaintiffs' counsel by authorizing him to receive $275 (of taxpayer money) for each hour spent "monitoring" Hope's implementation of its new magnet program—though this case would otherwise lie dormant.  *Id.* ¶ 19.  Hope did not inform the State before entering this new consent decree.

The State reached out to Hope's counsel about ending judicial supervision shortly after the Eighth Circuit's decision, then again this February and March.  *See* Letter to Counsel, Ex. A.  On the understanding that Hope would move for termination in the "very near future," the State offered its assistance.  *Id.*  The District has not yet acted.

## II.      The State May Intervene to Defend Its Interests in Education Policy

Arkansas's Department of Education and Board of Education are entitled to intervene in any case that might "impede [their] ability to protect [their] interest[s]" if "existing parties" do not "adequately represent that interest."  Fed. R. Civ. P. 24(a)(2).  This case checks both boxes.  The State  must ensure that Arkansas's students receive a constitutionally adequate education.  *See Lakeview Sch. Dist. No. 25 of Phillips Cnty. v. Huckabee*, 91 S.W.3d 472 (Ark. 2002).  Indeed, the State is constitutionally obligated to maintain a "general, suitable and efficient system of public schools."  Ark. Const. art. 14, sec. 1.  And the State can't be sure that school districts will adequately represent its sovereign interests.

*1. The State's Interests.*  Though the State has delegated some power over education policy to school districts, it retains the ultimate authority.  *See* Ark. Code Ann. 6-11-105(a)(1)

3

(confirming that the State Board of Education has "general supervision of the public schools of the state").  Consent decrees like Hope's interfere with the State's authority by bringing in a third party: federal courts.  Court supervision over schools was an extraordinary remedy necessary to overcome state-sponsored segregation.  *See Freeman v. Pitts*, 503 U.S. 467, 503-05 (1992) (Scalia, J., concurring) (tracing the history of desegregation remedies).  Still, ongoing judicial supervision raises acute "federalism concerns."  *Horne v. Flores*, 557 U.S. 433, 448 (2009).  Our constitutional structure ordinarily leaves education policy in the hands of state policymakers, not federal judges. *Id.*

For good reason: "[w]hen the school district and all state entities participating with it in operating the schools [may] make decisions in the absence of judicial supervision," they are more "accountable to the citizenry" and "the political process."  *Freeman*, 503 U.S. at 490 (majority op.).  Conversely, ongoing judicial supervision "bind[s] state and local officials to the policy preferences of their predecessors" and "deprive[s] future officials of their designated legislative and executive powers."  *Horne*, 557 U.S. at 449 (internal quotation marks omitted).  Thus, the Supreme Court has urged judges to "promptly" return authority to the State "when the circumstances warrant."  *Id.* at 450; *accord Freeman*, 503 U.S. at 490 ("Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system.").

And because consent decrees interfere with Arkansas's education policies, state law urges schools to terminate them as soon as possible.  Districts are required to keep the State apprised of any desegregation-related orders.  Ark. Code Ann. 6-13-113; Rules Governing Standards for Accreditation of Arkansas Public Schools and School Districts, Standard 3-A.10 (2020).[1]  And

---

[1] https://adecm.ade.arkansas.gov/Attachments/Standards_for_Accreditation_(Effective_7-1-20)_155605.pdf (last visited Dec. 15, 2022).

they must submit "detailed plan[s]" for "obtaining full unitary status and release from court supervision." *Id.* Standard 3-A.10.1. If the State suspects that a district is not actually following its unitary-status plan, it may put the district on probation. *Id.* Standard 3-A.10.2.

2. *Inadequate Representation.* The State cannot always count on the districts to "represent [its] interest[s]." Fed. R. Civ. P. 24(a)(2). School districts may be content to remain under federal supervision. *Horne*, 557 U.S. at 448-49; *Junction City*, 14 F.4th at 667. Hope's invocation of the consent decree to avoid participating in school choice illustrates as much. That district recognized that it was unitary in all respects. Doc. 169 at 113. Yet rather than seek to free itself of judicial oversight, it "sought to expand the consent decrees (and concomitantly expand federal oversight) to a whole new arena of school operations." *Junction City*, 14 F.4th at 668. And it has recently agreed to yet another consent decree, extending judicial supervision "until approximately October 2026"—and spending taxpayer money that should be used to educate Arkansas children to pay yet more money to plaintiffs' counsel. Compliance Letter, Ex. B at 2; *see* Doc. 205-1. To protect its sovereign interests and its taxpayers, the State must step in and do what Hope apparently will not.

### III.   Hope Has Complied with the 1990 Consent Decree

Hope's 1990 consent decree aimed to prevent "racial discrimination in any of [Hope's] school operations, including . . . faculty assignments, student assignments, and the treatment of black and other minority pupils within the school system." Doc. 38 ¶ 4. Hope has "complied in good faith with [this] decree since it was entered" and has eliminated "the vestiges of past discrimination . . . to the extent practicable." *Missouri v. Jenkins*, 515 U.S. 70, 89 (1995) (internal quotation marks and alterations in original omitted); *see also Green v. Cty. Sch. Bd. of New Kent Cty.*, 391 U.S. 430, 435 (1968) (instructing courts to examine a formerly segregated school's "faculty, staff, transportation, extracurricular activities and facilities"). Indeed, as Hope has acknowledged, it is unitary in every aspect addressed by the consent decree. Doc. 169 at 113.

Start with those aspects of the consent decree protecting black employees.  The consent decree required Hope to develop and use "objective, nondiscriminatory, job-related employment criteria" when deciding who to hire or promote.  Doc. 38 ¶ 5.  It could not hire based on nepotism. *Id.* ¶ 20.  If it wanted to use any other "subjective" criteria, it had to ensure that such criteria were "related to the job" and announced beforehand to ensure equal application to white and black applicants.  *Id.* ¶ 6.  It had to "post conspicuous notices" of any job opening, listing details about the position and hiring criteria.  *Id.* ¶ 9.  And it had to develop a "uniform salary schedule" to ensure fair compensation.  *Id.* ¶ 12.

Hope also committed to prioritize "underrepresentation of black staff."  *Id.* ¶ 5.  It aimed to ensure that "[n]on-administrative positions," such as "coaches, departmental heads, [and] band directors," would be "racially representative."  *Id.* ¶ 7. And it would "take special steps to [e]nsure that black staff members [were] distributed throughout all courses and programs of the system." *Id.* ¶ 8.

And because Hope had discriminated against some current employees in the past, it would specifically remedy that past discrimination.  The school promised to not retaliate against any of the named plaintiffs.  *Id.* ¶ 18.  If any plaintiff who had been passed over for non-administrative positions reapplied, they would be given "[s]pecial consideration." *Id.* ¶ 7.  And if any plaintiff still believed that he was being treated unfairly, his grievances would be heard by a special committee of the school board.  *Id.* ¶¶ 10, 19.

Hope has complied with each of these requirements.  *See* Compliance Report, Ex. B at 2 ("[Hope] believes it is currently in compliance" with the consent decree and has "equal employment opportunity policies."); Doc. 169 at 123. Hope posts job openings on its website, and

each posting lists the job's requirements and salary. *See* Job Listings, *Hope Public Schools*.[2]  It has developed comprehensive salary schedules, *see* Salary Schedules, *Hope Public Schools*,[3] and discloses the salary of each current employee, *see* eFinance Primary Pay Rate Annual Salary Report, *Hope Public Schools*.[4]  It seeks to hire minorities. *See* Three Year Action Plan, *Hope Public Schools*.[5]  And each of its schools employs both black and white individuals at all levels. *See* Ex. C (compiling data from the Arkansas Department of Education's My School Info website).[6]  Unsurprisingly, no party has invoked the consent decree to allege employment discrimination in over 20 years.[7]

The consent decree also obligated Hope to adopt an "affirmative inclusion policy"—that is, Hope had to affirmatively promote integration, rather than passively wait for desegregation. Doc. 38 ¶¶ 14-15.  That meant ending a three-track diploma system that classified students "by ability," *id.* ¶ 13, integrating "gifted and talented classes, advanced placement classes, the cheerleaders, basketball teams, Beta type clubs and referrals to Governor's school," *id.* ¶ 14, and crafting new disciplinary policies that did not "adversely and disparately impact . . . black pupils," *id.* ¶ 16. Hope also agreed to conduct in-service training on teaching students from different racial and social-economic backgrounds. *Id.* ¶ 17.

Again, Hope has fully complied: it "does not consider race when . . . determining student participation in school programs and activities or referring students for discipline." Ex. B at 2; *see*

---

[2] https://hope.tedk12.com/hire/Index.aspx (last visited Dec. 15, 2022).
[3] https://www.hpsdistrict.org/documents/state-required-information-a.c.a.- §-6-11-129/salary=schedules/1778 (last visited Dec. 15, 2022).
[4] https://core-docs.s3.amazonaws.com/documents/asset/uploaded_file/1572204/CONTRACTS22.pdf (last visited Dec. 15, 2022).
[5] https://core-docs.s3.amazonaws.com/documents/asset/uploaded_file/33/Hope_Public_Schools/2369905/HPSTeacherandAdministratorRetention-RecruitmentPlan_2022-2023.pdf (last visited Dec. 15, 2022).
[6] Additional data is available at myschoolchoiceinfo.arkansas.gov.
[7] In the only recent employment discrimination claim against Hope, this Court granted Hope summary judgment. *See Lovell v. Hope Sch. Dist.*, No. 4:17-cv-4101, 2019 WL 3082466 (W.D. Ark. July 15, 2019).

*also* Doc. 169 at 123-24 (acknowledging that Hope does not segregate advanced placement classes, basketball teams, cheerleading, or Governor's school referrals).  And no party has invoked the consent decree to allege race discrimination against black students in over 20 years.

Because Hope has indisputably complied with the 1990 consent decree for more than two decades, this Court should terminate that decree and declare Hope unitary.  *Junction City*, 14 F.4th at 668.

### IV.    The 2022 Consent Decree Should Not Have Been Entered

Even as it acknowledged no ongoing constitutional violations, Hope entered into another consent decree extending this Court's supervision for another four years and wasting taxpayer resources that should be used for education.  *See* Doc. 205-1 ¶ 20.  Indeed, the original parties to this case apparently dragged their feet on terminating the 1990 consent decree *in order to* enter this second decree—without advising the State beforehand.  Hope used the earlier decree to win grant money for a magnet program.  *See* 20 U.S.C. 7231c(1).  And plaintiffs' counsel, in turn, gets a near-$14,000-per-year windfall from this otherwise dormant case.  Doc. 205-1 ¶ 19.

This was improper.  The Eighth Circuit had already instructed this Court to pursue termination—even if Hope preferred to remain under judicial supervision.  *Junction City*, 14 F.4th at 667-68 (noting that this consent decree is problematic especially because the district is "happy to be sued and happier still to lose" (quoting *Horne*, 557 U.S. at 449)).  And with the validity of the old consent decree in doubt, Hope certainly shouldn't have "expand[ed] federal oversight[] to a whole new arena of school operations."  *Id.* at 668.  To the contrary, without being able to show that "current condition[s] flow[ed] from a violation of federal law," Hope *could not* ask this Court to expand its oversight.  *Id.*

Besides, Hope did not need to stay under the 1990 consent decree to get grant funding: federal law allows schools to receive such grants if they voluntarily "adopt and implement" an

"approved" plan "for the desegregation of minority-group segregated children." 20 U.S.C. 7231c(2). Indeed, some of the other grant recipients had adopted voluntary plans and were not under court orders. *See, e.g.*, ACES Application for Grants at 277;[8] Cedar Rapids Application for Grants at 13.[9]

Because Hope should never have entered this second decree, it cannot let that decree prolong judicial supervision. *Contra* Ex. B at 2 (noting Hope's plans to remain under supervision for three more years); Doc. 205-1 ¶ 20 (same). This Court should terminate that decree too and relinquish its jurisdiction over the Hope School District.

### Conclusion

Hope may not mind being bound by a decades-old consent decree. But it can't bind State policymakers too—not decades after any alleged violations had ceased. This Court should let Arkansas intervene and declare Hope School District unitary.

---

[8] https://oese.ed.gov/files/2022/10/S165A220044-Area-Cooperative-Educational-Services-ACES.pdf (last visited Dec. 15, 2022).
[9] https://oese.ed.gov/files/2022/10/S165A220016-Cedar-Rapids-Community-School-District.pdf (last visited Dec. 15, 2022).

Dated: April 7, 2023

Respectfully Submitted,

TIM GRIFFIN
Arkansas Attorney General

*/s/ Dylan L. Jacobs*
NICHOLAS J. BRONNI (Ark. Bar No. 2016097)
  Arkansas Solicitor General
DYLAN L. JACOBS (Ark. Bar. No. 2016167)
  Deputy Solicitor General
HANNAH L. TEMPLIN (Ark. Bar. No. 2021277)
  Assistant Solicitor General
OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
Phone: (501) 682-3661
Fax: (501) 682-2591
Email: Nicholas.Bronni@arkansasag.gov
        Dylan.Jacobs@arkansasag.gov
        Hannah.Templin@arkansasag.gov

*Attorneys for Intervenors*

10